# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EXHIBITION ON SCREEN, LTD.** | : | CIVIL ACTION |
| v. | : | |
| **DEREK PEW** | : | NO. 18-3212 |

## MEMORANDUM OPINION

**Savage, J.**                                                                                        **August 14, 2019**

Plaintiff Exhibition on Screen, Ltd. ("EOS"), a British documentary filmmaker, had a film distribution contract with Mediacast Holdings LLC, d/b/a Specticast ("Mediacast"), a Pennsylvania limited liability company. To recover its share of the box office proceeds due from Mediacast, EOS has sued Derek Pew, a Mediacast officer and board member who signed the contract on behalf of Mediacast. Having already obtained a judgment against Mediacast, EOS now seeks to collect from Pew, claiming he converted monies due under the contract.

Pew has moved for summary judgment, arguing that the undisputed evidence shows that the agreement did not create a trust. Even if it did, he contends the evidence demonstrates that he neither converted funds nor participated in any conversion by Mediacast. We agree that the undisputed evidence shows that Pew did not convert EOS's funds. Therefore, we shall grant Pew's motion for summary judgment.

## Background

Mediacast was a limited liability company engaged in distributing films.[1] Its board members were Pew, Mark Rupp, Joseph Field, and John McFadden.[2] Pew was the

---

[1] Def.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ¶ 1 (ECF No. 36) ("DSUF").

Chief Executive Officer; Rupp, the President and Chief Operating Officer; Gary Hawthorne, the financial controller.[3] EisnerAmper was the outside accountant.[4]

EOS and Mediacast entered into the film distributorship agreement on November 1, 2015, pursuant to which Mediacast agreed to distribute three documentary films produced by EOS.[5] Under the agreement, Mediacast contracted with theaters to show the three EOS films and generate box office receipts.[6] From the box office receipts, each theatre deducted its respective fees and remitted the balance to Mediacast.[7] From that amount, Mediacast deducted its share of the box office receipts and costs, yielding net receipts.[8] The agreement provided that the net receipts were to be "held on trust for EOS."[9]

From March 2016 to December 2017, Mediacast's business declined.[10] Pew deferred some or all of his salary.[11] Additionally, he contributed additional capital into Mediacast in 2015 and 2016, totaling $233,446.[12] Field also loaned money to the company.[13] Nonetheless, Mediacast defaulted on its loans.[14] On December 5, 2017,

---

[2] Pew Dep. 11-12, Def.'s Mot. for Summ. J. (ECF No. 35), Ex. 2; DSUF ¶ 2.

[3] Pew Dep. 11, 14; McFadden Dep. 57, Def.'s Mot. for Summ. J., Ex. 3; DSUF ¶¶ 3-5.

[4] DSUF ¶ 6.

[5] *Id.* ¶ 23.

[6] *Id.* ¶ 35.

[7] *Id.* ¶¶ 35-37.

[8] *Id.* ¶¶ 36-38.

[9] EOS-Specticast November 1, 2015 Agreement at 12, Def.'s Mot. for Summ. J., Ex. 6.

[10] Pew Dep. 204-05; DSUF ¶ 56.

[11] Def.'s Mot. for Summ. J., Exs. 13-14; Pew Dep. 204-05; DSUF ¶ 57.

[12] Def.'s Mot. for Summ. J., Ex. 15; DSUF ¶ 59.

[13] Hawthorne February 2, 2018 E-Mail to EisnerRamper, Def's Mot. for Summ. J., Ex. 5.

after a demand from its lender, Mediacast decided to wind down its business, a process that was completed by March 2018.[15]

EOS alleges that during the time it was operating, Mediacast collected $216,039.68 in net receipts that it did not distribute to EOS.[16] On November 29, 2017, EOS filed an action against Mediacast to recover its share of the receipts.[17] Default judgment was entered against Mediacast in the amount of $216,039.68 on February 27, 2018.[18]

EOS then filed this action against Pew, in his individual capacity, for breach of trust. Although we concluded that the complaint sufficiently alleged the creation of a trust by Mediacast, we held that EOS failed to state a cause of action against Pew personally.[19]

Undeterred, to circumvent our determination that it had failed to plead that Pew was liable for Mediacast's failure to turn over monies owed it, EOS filed an amended complaint naming only Pew and raising a cause of action for conversion. In the amended complaint, EOS alleges that Mediacast, as trustee, collected the net receipts and failed to remit them to EOS.[20] EOS avers that Pew hid the trust's existence from

---

[14] *Id.*

[15] Pew Dep. 36, 175-77; DSUF ¶ 60.

[16] Am. Compl. ¶¶ 19, 37 (ECF No. 27).

[17] *See Exhibition on Screen, Ltd. v. Mediacast Holdings, LLC, d/b/a Specticast*, No. 2:17-cv-05362 (E.D. Pa. Nov. 29, 2017).

[18] *Id.*

[19] *See Exhibition on Screen, Ltd. v. Pew*, 360 F. Supp. 3d 281 (E.D. Pa. 2018).

[20] Am. Compl. ¶¶ 19-20.

3

Mediacast officials and its accountants, and converted the funds.[21] It alleges that "Pew decided to hide/not establish the Net Receipts Trust within Mediacast, in order to allow him to deposit/spend 100% of the Films' box office receipts for his own personal benefit."[22] According to EOS, Pew hid or mislabeled the money as corporate income and then used it for his own compensation "when the only cash Mediacast had were Trust funds."[23]

**Standard of Review**

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. FED. R. CIV. P. 56(A). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Bare

---

[21] *Id.* ¶¶ 21, 25-35.

[22] *Id.* ¶ 24.

[23] *Id.* ¶¶ 38-39.

4

assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**Analysis**

Pew contends that the agreement did not create a trust and did not require a separate account for EOS's net receipts. He also argues that the undisputed evidence proves that he did not receive any funds and did not participate in any affirmative conversion by Mediacast.[24]

In response, EOS contends that Pew personally intervened in the normal business operations to embargo delivery of EOS's share of the funds Mediacast received from the films' screenings. EOS contends that Pew used EOS's monies to fund Mediacast's "end-of-life operations" and to pay its rent. EOS maintains that Medicast transferred $683,000 to another company of Pew's, Boathouse Communications Partners ("BCP").

Under Pennsylvania law, "[c]onversion is an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession." *Baram v. Farugia*, 606 F.2d 42, 43 (3d Cir. 1979) (citing *Norriton E. Realty Corp. v. Cent.-Penn Nat. Bank*, 435 Pa. 57, 60 (1969)). A plaintiff must show "an intent to exercise dominion or control over

---

[24] Because we find that there is no genuine issue for trial on the conversion claim, we need not reach the issue of whether there was a trust created.

5

the goods which is in fact inconsistent with the plaintiff's rights." *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987).

"A person not in lawful possession of a chattel may commit conversion by intentionally dispossessing the lawful possessor of the chattel, by intentionally using a chattel in his possession without authority so to use it, by receiving a chattel pursuant to an unauthorized sale with intent to acquire for himself or for another a proprietary interest in it, by disposing of a chattel by an unauthorized sale with intent to transfer a proprietary interest in it, or by refusing to surrender a chattel on demand to a person entitled to lawful possession." *Baram*, 606 F.2d at 43-44 (citing RESTATEMENT (SECOND) OF TORTS § 223 (1965)). "Identifiable funds are deemed a chattel for the purposes of conversion." *Pioneer Commercial Funding Corp. v. Am. Fin. Mortg. Corp.*, 855 A.2d 818, 827 n.21 (Pa. 2004); *see also Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. Ct. 2003) (internal citations omitted) (money may be the subject of conversion). Moreover, "[n]ot every . . . deprivation of property amounts to a conversion; there must be an actual appropriation of it by the offending party for his own use." *Chrysler Credit Corp. v. Smith*, 643 A.2d 1098, 1100 (Pa. Super. Ct. 1994) (quoting 37 P.L.E. Trespass § 81).

The parties dispute the nature and extent of Pew's role in Mediacast. Pew testified that his role was "limited" and it was his responsibility to negotiate deals for new content distribution.[25] Rupp and Hawthorne were responsible for Mediacast's daily operations, which included accounting for the proceeds of the film screenings.[26] EOS

---

[25] Pew Dep. 30, 32, 33-34, 59.

[26] *Id.* 33, 41-43, 45-46, 106-07, 115, 137-38, 216-17.

6

does not dispute that Rupp was in charge of Mediacast's operations.[27] Both Pew and McFadden testified that Rupp was "the one who ran the business."[28] They also testified that Hawthorne was in charge of accounting and finance, kept the books and records, and completed Mediacast's financial transactions.[29] Pew testified that he was not involved in the collection or distribution of funds.[30] EOS sent its invoices to Hawthorne.[31] Rupp, Hawthorne, and Tom Pearce, a Mediacast billing coordinator, were on the emails with theatres discussing the movie screenings, ticketing sales, box office receipts, accounting, and invoices.[32]

EOS has failed to identify any evidence that contradicts or controverts the facts presented by Pew. Instead, EOS relies on speculation and conjecture. The essence of EOS's argument is that Pew is responsible for Mediacast's failure to remit the net receipts because EOS was not paid and a trust account was not established. These failures, according to EOS, show that Pew never instructed Mediacast employees to do so.

To support its contention that Pew converted its money, EOS relies on the testimony of Phil Grabsky, its managing director and designated Rule 30(b)(6) witness. It also refers to the following documents. First, it cites an email from Pew responding to Grabsky's request for payment that because "costs are up front, [ ] deductions come

---

[27] *Id.* 31-33.

[28] Pew Dep. 31-33; McFadden Dep. 57.

[29] Pew Dep. 45-47; McFadden Dep. 57-58.

[30] Pew Dep. 41-42, 115.

[31] Grabsky Dep. 67-68, Def.'s Mot. for Summ. J., Ex. 11.

[32] EOS-Specticast E-Mails, Def.'s Mot. for Summ. J., Ex. 5.

7

first before any splits, and [Mediacast's] receipts will be slow to bill and collect," causing delay in EOS's reimbursement.[33] Next, EOS cites an affidavit from Rupp in which he states that he reported to Pew and did not "recall" being instructed or authorized by Pew to discuss or pay EOS's account.[34] There are also e-mails from Rupp to Grabsky in which he states that Grabsky should be talking with Pew directly about the EOS account because he had not been authorized to discuss the EOS account and Pew was handling all EOS matters.[35] Lastly, EOS cites Pew's testimony that Mediacast transferred funds for payroll to BCP.[36]

None of this evidence shows Pew exercised any dominion or control over the net receipts for his own use or benefit. Pew was not involved in the accounting side of Mediacast's business operation.[37] He did not collect and deposit monies received from theatres.[38] To overcome this fact, EOS argues that Pew had general "blocking control" of Hawthorne's duties and did so with respect to the EOS account.[39] Yet, it cites to no evidence in the record to support this argument. There is no evidence that Pew himself took control of any money, let alone EOS's net receipts. Grabsky admitted that he was not aware if Pew was even compensated.[40] Nothing in Rupp's testimony or e-mails establishes, directly or indirectly, that Pew exercised control over any funds. Instead,

---

[33] Pew November 23, 2016 E-Mail, Pl.'s Opp'n to Mot. for Summ. J., Ex. 4 (ECF No. 39-5).

[34] Rupp Aff. ¶ 6, Pl.'s Opp'n to Mot. for Summ. J., Ex. 5 (ECF No. 39-6).

[35] *Id.* ¶¶ 7-9.

[36] Pew Dep. 83

[37] *Id.* 59.

[38] *Id.* 41-42.

[39] DSUF ¶ 13; Pl.'s Statement of Disputed Facts Precluding Summ. J. ¶ 13 (ECF No. 38).

[40] Grabsky Dep. 122.

8

the undisputed evidence demonstrates that Hawthorne was responsible for Mediacast's accounting and accounts payable.

EOS contends that Pew did not advise the other members of Mediacast that the agreement required Mediacast to deposit net receipts in a separate account for EOS. Pew testified he did not believe the agreement created a trust; and, in any event, the agreement was made available to all members and staff. He does not know if each member read it.

EOS claims it was Pew's responsibility to execute the terms of the agreement, including instructing his employees to establish a trust account for EOS and not to commingle operating funds with EOS's net receipts. Pew had no legal obligation to do so. He executed the agreement as an officer of Mediacast and not in his individual capacity.

Grabsky's explanation for the basis of his claim reveals that EOS's contention that Pew converted its funds is founded on speculation and conjecture. Grabsky testified that it was his "contention that Derek Pew was personally responsible to ensure that the trust account was set up and that [the] money . . . made its way to the rightful owners," and that "as far as [he was] concerned, [Pew]'s responsible."[41] Grabsky bases his conclusions on "these two-and-a-half very painful years" of litigation, lack of any information, and because EOS was "not being paid."[42] Grabsky admits he does not have any information about the conversations and the knowledge of Mediacast's board members and staff.[43] In the absence of such evidence, he claims that "unless Mr. Pew

---

[41] *Id.* 48-50.

[42] *Id.* 80-84.

[43] *Id.* 90-96.

can prove a trust account was established, then [EOS's] contention is that he never informed his employees to establish that account."[44] Grabsky explained his reason for suing Pew is based on his surmise that if Pew did not establish a trust account, then he must have taken the money. Grabsky stated that he was making a "pretty informed guess" that EOS's money went to pay other accounts and towards Mediacast's rent.[45] However, he cites to nothing in the record to support or confirm his suspicions.

In essence, EOS is arguing that because it was not paid, Pew must have taken the money himself unless Pew can trace Mediacast's accounting of the funds. This is speculation and personal belief.

At most, Mediacast, not Pew, may have mismanaged EOS's funds. In that event, Pew could be liable under the participation theory. The participation theory imposes individual liability on a corporate officer who personally directed or participated in a tortious act. *Shonberger*, 530 A.2d at 114; *Accurso v. Infra-Red Servs., Inc.,* 23 F. Supp. 3d 494, 507 (E.D. Pa. May 28, 2014) (quoting *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 614-22 (1983)). In that case, the corporate officer may be liable for misfeasance. *Chester Cambridge B. & T. v. Rhodes*, 31 A.2d 128, 131 (Pa. 1943). But, if the corporate officer does not make a promise in his individual capacity, he cannot be liable under the participation theory. *Accurso*, 23 F. Supp. 3d at 5-7 (quoting *Walsh v. Alarm Sec. Grp.*, Inc., 95 Fed. App'x 399, 402 (3d Cir. 2004)). Stated differently, for the agent to be held personally liable, "he must have made promises while acting in his

---

[44] *Id.*

[45] *Id.* 236.

10

individual capacity—that is, intending to bind himself personally." *Id.* (internal citations omitted).

EOS claims Pew directed, participated, or cooperated in conversion because he instructed Rupp not to talk with Grabsky and because Pew was generally in charge of the company. EOS, however, does not point to any record evidence that Pew directed the monies be withheld from EOS or that EOS's money be used towards other purposes, such as rent or to fund other companies. EOS assumes that Pew must have been involved because of his status, even though Grabsky admits there is no evidence and he is speculating.[46]

Even if Pew had a responsibility to act but failed to do so, he is not liable. Liability only attaches to those who participate in the wrongful act and not for actions an officer "failed to take." *See Aldorasi v. Crossroads Hosp. & Mgmt. Co., LLC*, No. 17-4580, 2018 WL 4613939, at *7 (E.D. Pa. Sep. 25, 2018) (corporate officer liable under the participation theory only for misfeasance, "i.e., the improper performance of an act," not nonfeasance, "i.e., the omission of an act which a person ought to do") (citing *Loeffler v. McShane*, 539 A.2d 876, 878 (Pa. Super. Ct. 1988) and *Wicks*, 470 A.2d at 90). In short, Pew can only be held liable if he wrongfully converted or directed the conversion. There is no evidence that he did either.

## Conclusion

After viewing the undisputed facts in the light most favorable to EOS and drawing all reasonable inferences in its favor, we conclude that there is no evidence from which a reasonable jury could find that Pew converted EOS's monies. EOS rests its case on

---

[46] *See supra* notes 39-45.

11

bare assertions and suspicions. There is no genuine issue for trial. Therefore, Pew is entitled to judgment as a matter of law.